**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0315n.06

No. 10-2188

| | | |
|---|---|---|
| UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT | | |

**FILED**

***Mar 22, 2012***

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Armando Felix Trejo, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: SILER, ROGERS, and WHITE, Circuit Judges.

ROGERS, Circuit Judge. Armando Trejo appeals from his conviction of transportation and possession of child pornography. His arguments are many, but ultimately all are unavailing. His parents had apparent authority to consent to the searches and seizures of the family computers where police found much of the evidence at trial, and the district court did not err in finding that their consent was lawfully given. The admission of arguable other-acts evidence — consisting of the account record of one of Trejo's America Online accounts and a partial chat — was not plain error and did not affect Trejo's substantive rights. Nor has Trejo shown any purposeful acts by the Government that could rise to the level of prosecutorial misconduct. The opinion testimony given by two of the Government's witnesses was offered to clarify their other testimony, and in any event did not affect Trejo's substantive rights. Finally, Trejo failed to object to testimony regarding a

question Trejo's father asked police during the search of the computers, and so whether or not the question constituted impermissible hearsay, it was not plain error to admit it.

I.

Search and seizure of the family computers

In July 2008, law enforcement officials traced images of child pornography found on a computer in St. Louis to America Online (AOL) email accounts opened with the credit card of Armando Trejo. On July 17, 2008, two plainclothes police officers went to Trejo's home, where he lived with his parents Raymond and Rose Trejo, to speak with him. Armando Trejo was not home, but Raymond Trejo was. The officers identified themselves and said they were looking for Armando Trejo and following up on a lead about inappropriate images being sent from the house. Raymond Trejo responded by asking if it was child pornography, to which the officers responded yes. Raymond Trejo showed officers the family computer in the dining room. Whether Raymond Trejo consented to a search and seizure of the computer is disputed, but officers did so, and ultimately found 88 images of child pornography and 188 images of child erotica on the computer under Armando Trejo's user account. The user account was not password protected.

More than a year later, on August 27, 2009, officers returned to the Trejo residence to arrest Armando Trejo. They noticed that a new computer sat in the dining room, and asked Rose Trejo if they could search it. Again, whether Rose Trejo lawfully consented to the search is disputed, but officers did conduct a preliminary search by clicking on the icon that accessed Armando Trejo's user account. The account was again not protected by a password, and almost immediately the officers

found photos of Armando Trejo in various states of undress. The officers told Rose Trejo they would need to remove the computer. Officers ultimately found 3011 images of child pornography and 175 images of child erotica, downloaded on 21 separate occasions.

Trejo was charged with seven counts of transportation of child pornography in violation of 18 U.S.C. § 2252A(a)(1) and one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Trejo moved to suppress the evidence retrieved from the computers, arguing that neither of his parents had the authority to consent to the searches and seizures, and even if they did, they did not lawfully consent. The district court denied the motion. It found that both Rose and Raymond Trejo had apparent authority to consent to the searches, given the placement of the computer and lack of password on Armando Trejo's computer user accounts. The district court also held that both parents had lawfully consented to the searches and seizures.

Trejo's trial was conducted over five days, beginning April 21, 2010 and concluding April 27, 2010. This appeal requires a focus on the testimony of three individuals:

Justyna Kilbourne's testimony, Exhibit 9A, and surrounding prosecutorial conduct

Justyna Kilbourne, a senior criminal investigator with AOL, testified for the Government on April 22, 2010. The decision to include Kilbourne's testimony was made just prior to trial. On April 16, five days before the trial began, the Government served a search warrant on AOL for additional records regarding Armando Trejo. That information arrived on April 20, 2010, at which point the Government sent copies of it by overnight FedEx to Trejo's counsel, and sent an email notifying

Trejo's counsel to expect the documents. For unclear reasons, the packet was not received until after trial.

Kilbourne testified that AOL monitors accounts for transmission of child pornography, and does so by having a database of images identified as child pornography, assembled by professionals, through which all emails are automatically filtered. Such images are automatically removed from the system and referred to the National Center of Eliciting Exploited Children. Kilbourne testified that account aaatf456 was opened on February 20, 2008, at 12:01:49 am EST with Trejo's credit card, and that on that same day at 4:06:06 am EST the system caught an illegal image, and so AOL terminated the account at 6:05 am on February 21, 2008 for "graphic file imaging." The account history for account aaatf456 was entered as Exhibit 9A with no objection. Kilbourne testified that another account, aafftttttt234, was opened and quickly terminated for the same reason. On redirect, Kilbourne testified that she had specific knowledge of why AOL accounts aaaft456 and aafftttttt234 were terminated, and that was "an illegal graphic transfer." When asked whether that meant child pornography, she responded "correct."

The next day, counsel for Trejo objected to Kilbourne's testimony. Trejo's counsel said that he had received inadequate notice and discovery about Exhibit 9A, which had not appeared in the exhibit list proffered the first day of trial (though it was included in the trial materials), and inadequate notice about the nature of Kilbourne's testimony. Counsel also objected on Fed. R. Evid. 404(b) grounds. The district court asked counsel for Trejo "what do you want me to do," "tell me what you want," to which counsel replied "I want an explanation." Counsel for the Government then

explained the process by which they came to the information and that they had in fact sent it to Trejo's counsel. The district court concluded that given that the witness had already testified, and that there was no evidence that Government counsel had not done what they could to make counsel for Trejo aware of the late addition, there was not much else to be done. The district court continued: "it seems to me that the communication between counsel could be better here. It seems to me that we could have had 9A listed affirmatively in a witness list and provided by hand to the lawyer before we went through the witness." The district court said it sympathized with counsel for Trejo and told him to take action:

> If you want me to strike the evidence after the fact; if you want me to declare a mistrial; if you want me to report the prosecutors to the State Bar; if you want me to find in favor of your client and dismiss the case, I'll consider all that stuff, but you have to file a piece of paper with authorities for me to do that before I can do anything.

Counsel for Trejo made no such filing. The following week, the district court instructed counsel that due to the uncertainty surrounding the evidence, Exhibit 9A should only be used "as evidence of ownership of the relevant accounts and the relevant information contained on the computer and not to argue this to the jury as a separate crime or separate bad act that would impact the defendant's knowledge."

Testimony of Jerry Derosia and Exhibit 27

Jerry Derosia, a forensic computer examiner who extracted a number of files from the computers, testified for the Government on April 23rd and 26th. Derosia testified that he found

3,011 images of child pornography on Trejo's computer, and explained that "[c]hild pornography that I'm looking for are any naked, partially naked children that are engaged in any kind of sexual activity, that have their genitalia exposed or are having sex with adults or other children or performing sex acts." He also testified that images of child erotica were of evidentiary significance for him, and when asked what child erotica was, said the following:

> Child erotica in the state system we have what's called child sexually abusive material which we — that would be our level of child pornography in the state system which is different than the federal system. . . . The child erotica doesn't rise to the level of that child sexually abusive nature of the pictures. What they will be is something that can be considered as artistic to some. They would be pictures of a nature that were either clothed or partially clothed children that might not be of a sexual nature but still may show them not in a sexual light but in another nature.

Derosia testified that he found 175 such images on the computer. The Government then had a picture from the computer that Derosia said he would characterize as child erotica admitted into evidence.

During Derosia's testimony, the Government introduced Exhibit 27, which was an excerpt of a chat found on the computer. The chat was between an unknown individual and AOL account aaatf456 (whose account history had been introduced during Kilbourne's testimony as Exhibit 9A), and was a graphic discussion about performing sexual acts with young children. Derosia testified that he found the chat in the computer's page file system, but could not link it to a particular user account on the computer. Counsel for Trejo did not object at the time, but did so at a recess shortly after the exhibit was introduced. The Government explained that "[t]he purpose of the entry of this exhibit is to show that a screen name that has been connected to the defendant had a conversation

involving the sexual exploitation of children." The district court found the exhibit to be evidence of other acts, and that "it's being offered to tie in Mr. Trejo's knowledge and ownership of the account on which it was found on the second computer."

Testimony of Detective Brian regarding Raymond Trejo's question

Finally, Detective Joe Brian, who was among the group who went to Trejo's house for both seizures, testified. During his testimony, he recounted his conversation with Raymond Trejo that had occurred on July 27, 2008, including Raymond Trejo's asking whether the police were looking for child pornography. Counsel for Trejo did not object during the testimony.

The jury found Trejo guilty of all eight counts of the indictment, and he was sentenced to 210 months' imprisonment and five years of supervised release. Trejo timely appealed his conviction.

II.

A. Search and seizure of the family computers

The seizures and subsequent searches of the two computers in the Trejo residence's dining room on July 17, 2008 and August 27, 2009 were lawfully performed. Both Raymond and Rose Trejo had apparent authority to consent to the seizure of the computers. The computers were in the dining room, both Raymond and Rose Trejo had access to them and in fact used them regularly, and they paid the internet connection bill. We have held in similar cases involving computers in

residences with other family members that apparent authority is established by features like location and use. For example, we held that a defendant's wife had apparent authority to consent to a seizure of the family computer where "the computer was located in a common area to which [she] had complete access, and she indicated to the officers who came to her home that she had access to and used the computer and that she and the Defendant did not have individual usernames or passwords." *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006).

The fact that Armando Trejo had an individual user profile on the computer does not change his parents' apparent authority because the profile was not password protected. The key to an authority assessment is the consenter's access to and use of the item in question:

> The authority which justifies the third-party consent . . . rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974); *see also Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). While the existence of user profiles on a computer does suggest an expectation that generally only that particular person will have reason to access the content saved to that profile, it is reasonable to understand that other family members may have occasion to access profiles without passwords on a general-use family computer. If a user chooses not to protect a profile with a password or otherwise indicate an intention to restrict third-party access, a reasonable officer could conclude that other family members have authority to consent to its search.

Although we have never confronted the precise situation here of non-password-protected user profiles, in *United States v. Aaron*, 33 F. App'x 180, 184 (6th Cir. 2002), we concluded that though the defendant owned the computer in question, his live-in girlfriend had authority to consent to a search of it because the defendant never forbade her from accessing it, and did not "restrict[] her access with password protections." Other circuits have also emphasized that it is the existence of the password that eliminates apparent authority to consent to computer file searches. *See, e.g.*, *United States v. Stanley*, 653 F.3d 946, 950-51 (9th Cir. 2011); *Trulock v. Freeh*, 275 F.3d 391, 403 (4th Cir. 2001). The district court correctly pointed out that from the standpoint of general social expectations, a user profile with no password is not the equivalent of a "keep out" sign, or otherwise an indication that others do not have access to the profile and its contents:

> A user may choose to create a user profile — instead of using another's profile — for purposes of saving his or her preferred settings in order to avoid having to reconfigure them each time they use the computer after another has used it or changed the settings. Or, a user may do so in order to have a personal photograph saved as the desktop background. Other reasons exist as well. These reasons would not indicate, by themselves, an intent to exclude others from using or accessing the profile. If a user of a communal computer wants to limit the access of other co-users, he may do so with a password.

*See, e.g., United States v. Waller*, 426 F.3d 838, 843-44 (6th Cir. 2005) (discussing individual's expectation of privacy). Under these circumstances, it was entirely reasonable for the detectives to conclude that Armando Trejo had allowed other users of the household's computer access to his profile.

There was no ambiguity in the question of Raymond or Rose Trejo's apparent authority that would necessitate further inquiry on the part of the officers. "[I]f the circumstances make it unclear

whether the property about to be searched is subject to mutual use by the person giving consent, then warrantless entry is unlawful without further inquiry." *Waller*, 426 F.3d at 846 (internal quotation marks omitted). Trejo suggests that Raymond Trejo's acknowledgment that he owned an additional laptop, and his inquiry as to whether the detectives were looking for child pornography, created such ambiguities, but we do not see how they would. Trejo also argues that Rose Trejo's hesitance to consent to the seizure created ambiguity, but in this he mixes the issue of apparent authority with that of lawful consent. Nothing about the circumstances of this case created an ambiguity necessitating further inquiry, and based on the facts of this case, it was not unreasonable for the officers to believe that Trejo's parents had authority to consent. *Illinois*, 497 U.S. at 188.

In addition, the district court's finding that Raymond and Rose Trejo both lawfully consented to the seizures was not clear error. In both situations, detectives who were at the house testified that Raymond Trejo on July 17 and Rose Trejo on August 27 verbally consented to having the computers taken. Although Raymond and Rose Trejo testified at the suppression hearing that they did not freely consent to the search, but rather remained silent and felt they had no choice but to let the detectives take the computers, the district court could weigh the facts and credibility of the witnesses and come to the conclusion that it did. "Findings of fact anchored in credibility assessments are generally not subject to reversal upon appellate review." *United States v. Taylor*, 956 F.2d 572, 576 (6th Cir. 1992). The district court's opinion shows that the district court weighed the testimony carefully, and also took into account the fact that the detectives were in plainclothes and that parties agreed that the encounter was conducted in a calm and respectful manner, which lessens the potential

for intimidation.  The conclusion that the Trejo parents consented to the seizures, and that their consent was freely given, is not clearly erroneous.

B.  Testimony regarding Exhibits 9A and 27 as other acts testimony

The district court did not commit plain error in admitting Kilbourne's testimony regarding Exhibit 9A, the account history of aaatf456.[1]  There were a number of permissible uses under Fed. R. Evid. 404(b) for which the testimony could have been entered, including proof of ownership, which was the reason eventually adopted by the district court.  Although counsel for Trejo did stipulate that the accounts at issue were his, his main defense is that someone else sent the illegal images over them.  Exhibit 9A was introduced to argue against this defense.  The exhibit shows that a prohibited image was transferred over one of Trejo's accounts a mere four hours after it was opened, at 4 am.  The allowable inference from such evidence was that the account was in Trejo's sole control when the image was transferred and that the transfer took place at an unlikely time for others to be awake.  Stipulations cannot exclude the bedrock of the Government's case: "the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away." *Old Chief v. United States*, 519 U.S. 172, 189 (1997).

---

[1]Trejo's objection occurred well after Kilbourne's testimony, and consisted of some unclear statements amid a much longer objection regarding insufficient notice.  Given the muddled nature of the objection, and because it was not made contemporaneously, we review only for plain error. *See United States v. McCaskill*, 202 F. App'x 70, 76 (6th Cir. 2006) (citing *United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir. 1990)).

Exhibit 27, the partial chat, presents a somewhat more difficult case for several reasons: Trejo's attorney objected to it closer in time to its admission (though still not contemporaneously); it is harder to argue that its admission was for a proper purpose; and the chat is potentially more prejudicial than the account record because it is qualitatively different than other evidence presented. Ultimately, however, admission of the chat cannot be shown to have affected Trejo's substantive rights. The district court gave the jury a limiting instruction, and a chat about sexual relations with children is no more inflammatory than the graphic photographs of child pornography shown to the jury. Trejo's counsel also had the opportunity to redact sections of the chat before it was shown to the jury. We have held that the harmlessness of an error must be measured by "what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened." *United States v. Cowart*, 90 F.3d 154, 158 (6th Cir.1996) (citations and quotations omitted). Taken in the context of the trial as a whole, and in light of the overwhelming evidence that linked Trejo with the accounts, any potential error in the admission of the chat was harmless. We also observe that Trejo's defense that someone else was using his accounts was no less consistent with the chat than with the pictures.

C.  Accusations of prosecutorial misconduct

Trejo has failed to explain how the prosecution's conduct in connection with the AOL accounts and testimony by Kilbourne constitutes prosecutorial misconduct. Trejo's brief lists a number of inactions on the part of the prosecution that Trejo's counsel claims indicate a willful

campaign of delay and concealment designed to take him by surprise, but he offers no evidence as to why such actions could not be understood as those of a busy trial team in the thick of last-minute preparations. Trejo has shown no impropriety on the part of prosecution, which is the main showing needed for a prosecutorial misconduct determination. *See United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001).

For example, Trejo's brief first contends that notice about the AOL accounts should have been given earlier, on April 16, 2010, when the search warrant for the records was first requested. It is a judgment call as to whether to alert opposing counsel to a search warrant request before one knows the results. On the facts here, no violation of Fed. R. Civ. P. 16(c)'s continuing duty to disclose has been shown. Second, though the Government sent copies by overnight FedEx of the AOL records and emailed Trejo's attorney that it had done so on the same day it received them, Trejo's counsel complains that the email was "late" at 4:45 pm of the day in question, and he did not receive the materials until after the trial. Trejo's brief argues that given the importance of the evidence, opposing counsel should have made "personal or telephone contact" with Trejo's counsel, confirmed receipt of the FedEx package, checked on the package's status, etc., and their failure to do so indicates a purposeful effort to keep him in the dark. While such actions may have been courteous, it is unrealistic to require them in light of all the tasks surrounding trial preparation; indeed, their omission can hardly constitute bad faith. Third, Trejo's counsel contends that the Government "hid" the new evidence by first failing to list it on the exhibit list given to the court on the first day of trial, April 21, and then not including "amended" at the top of the updated exhibit list

circulated on April 23. Again, such actions are just as easily attributable to oversight as to malevolence. As the district court put it:

> [T]he fact that something is omitted from an exhibit list, the fact that an exhibit list is amended and the fact that evidence is obtained during trial and provided is something that happens. Now, I don't know the prosecutors intimately, but I do know that based on their conduct here and in other cases, they are not the type of people who would try to, quote/unquote, get anything by a defense attorney. In fact, I think the record is replete with good-faith efforts of the government to comply with all discovery.

Without more than bare accusations, there cannot be a showing of prosecutorial misconduct.

This is not an instance of a complete failure to disclose like that encountered in *Brady v. Maryland*, 373 U.S. 83 (1963), and subsequent cases finding misconduct where evidence was deliberately suppressed and never provided. This case is not even like *United States v. Wheeler*, 391 F. App'x 452, 454 (6th Cir. 2010), where the prosecutor failed to turn over an entire box of evidence prior to trial, only realizing the issue and correcting it on the second day of trial. Even there, we held that because the defendant "failed to show both that the omission was purposeful and that there was a reasonable probability that disclosure of the evidence would have changed the result of the proceeding," no misconduct occurred. *Id.* While the evidence contained in Exhibit 9A was powerful, in this case fault for the failure of the evidence to arrive in a timely fashion presumably lay with FedEx, not with the Government. Counsel for Trejo was in just as good a position to check in with FedEx as to why the documents had not arrived when they were supposed to.

The district court found no bad faith on the part of the Government, and did what it could in the midst of trial to mitigate the adverse effect of the evidence's admission. Any additional prejudice

resulting from the prosecution's conduct could have been mitigated had Trejo's lawyer taken appropriate action. When Trejo's lawyer explained the situation to the district court, the court sympathized with his plight, but told him that he needed to file some sort of motion explaining what relief he sought at that late point. Trejo's lawyer did not do so, instead opting to continue complaining without offering any solution for how to remedy the issue. In the face of such inaction at the court below, now is not the time to provide a remedy for counsel's complaints.

D. Lay testimony of Jerry Derosia and Justyna Kilbourne

It was not plain error for the district court to admit the unobjected-to testimony of Jerry Derosia regarding child erotica because he discussed it minimally, and only as a method to explain his other testimony. Further, even if Derosia's testimony on child erotica should not have been admitted, it did not affect Trejo's substantial rights to due process, a requirement for reversal under plain error. *See United States v. Evans*, 883 F.2d 496, 499-500 (6th Cir. 1989). Testimony regarding child erotica and the admission of a sample photograph undoubtedly had little, if any, impact in the face of evidence of undisputed child pornography.

Admission of Kilbourne's testimony regarding child pornography was similarly not plain error, because taken in context it is evident that she was not expressing an opinion regarding the pornographic content of the images in question. She explained multiple times during her testimony that images of child pornography were tagged automatically by AOL's system and removed, and the associated accounts terminated. Her labeling the images child pornography was simply shorthand

for this automatic process conducted by the system itself. Although Trejo's brief claims that

Kilbourne testified that she saw the actual pornographic images, that assertion is far from clear from

the trial transcript:

| | |
|---|---|
| [Kilbourne] | Does AOL have any images in their possession right now? |
| [Counsel] | Yes. |
| [Kilbourne] | Regarding? |
| [Counsel] | Regarding this investigation. |
| [Kilbourne] | Yes, we have documentation. |
| [Counsel] | You have some images? |
| [Kilbourne] | Do we have – we keep a record of everything that we turn over to law enforcement. |
| [Counsel] | Has that been turned to anyone? |
| [Kilbourne] | To law enforcement, yes. |
| [Counsel] | Do you have the actual what you believe are transmission times of these images? |
| [Kilbourne] | Yes. |
| [Counsel] | Okay. That's all I want to know. |

Even if one does read the transcript testimony to mean that Kilbourne saw the images, the rest of her

testimony confirms that her statement that the images transferred by the accounts in question were

child pornography was primarily based not on her personally seeing the images, but from reading

the records produced automatically by the system. Under such circumstances, one cannot fault the

district court for allowing the testimony. Again, even if it was admitted erroneously, its potential

for harm was so minimal that there is no ground for reversal.

E.  Raymond Trejo's question as potential hearsay

Finally, it was not plain error for the district court to admit Detective Brian's testimony

regarding his conversation with Raymond Trejo when Trejo failed to object to it at trial. *See Evans*,

883 F.2d at 499 (reciting standard). Detective Brian testified that when he told Raymond Trejo that he was at the house looking for his son, Armando, and following up on a lead about inappropriate images being sent from the house, Raymond responded by asking if it was child pornography. Even if Raymond Trejo's comment constituted impermissible hearsay, the issue was ambiguous enough that it was not clear error to admit it. We have recognized that "a question is typically not hearsay because it does not assert the truth or falsity of fact." *United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003). It is not immediately clear from Raymond Trejo's question what, if anything, is being asserted. In *United States v. Green*, 548 F.2d 1261, 1267 (6th Cir. 1977), we declined to reverse a conviction because of an allegation of hearsay when the application of the rule was ambiguous: "Given the ambiguous content of the statements and their decidedly nonassertive tone, we cannot say that their evidentiary use against the declarant as admissions impinged upon substantial rights which he enjoyed at trial." In *Preferred Properties, Inc., v. Indian River Estates, Inc.*, 276 F.3d 790, 798 n.5 (6th Cir. 2002), we reached a similar conclusion, that admission of evidence presenting a close legal question regarding hearsay did not constitute plain error. Raymond Trejo's question in this case can be understood in a number of ways, at least some of which may not have constituted hearsay. It was not plain error for the district court to admit it.

III.

We affirm the judgment of the district court.